Levering and Brady *v.* Norvell.

L. LEVERING *et al. v.* L. C. NORVELL *et al.*

and

M. B. BRADY & CO. *v.* L. C. NORVELL *et al.*

1. FRAUDULENT CONVEYANCE. *Voluntary conveyance of property in fraud of creditors.* Norvell, Boone & Co., of Memphis, obtained credit from Brady & Co., in New Orleans, through one of their members (McKeon), upon the faith of his individual estate, which he promised should remain in his own name, and be subject to his debts; that soon afterwards McKean made a voluntary conveyance of his property, when his firm was in doubtful circumstances, without warning Brady & Co., who continued the credit previously obtained. *Held,* such a conveyance is evidence of fraud, in fact, and the registration of the deed does not alter the case. The property so conveyed will be liable to the satisfaction of debts due such creditor, though contracted subsequent to the conveyance. A debtor has no right to convey all of his tangible property and leave his creditors to take their chances of realizing their debts from assets, consisting of bills and accounts payable, where the proof fails to show that such assets were available to creditors. As the deed is void for fraud, in fact, all the creditors will be allowed to share the proceeds.

Cases cited: White *v.* Bettis & Capps, MS.; Martin *v.* Oliver, 9 Hum.; Churchill v. Well, 7 Col., 364.

2. SAME. *Same. Payment of debts. Does not rebut evidence of fraud. When.* Where a debtor makes a voluntary conveyance and afterwards pays a large part of his liabilities, this does not rebut the evidence of fraud.

---

FROM SHELBY.

---

Appeal from the Chancery Court. R. J. MORGAN, Chancellor.

No record can be found.

McFARLAND, J., delivered the opinion of the court.

The firm of Norvell, Boone & Co. was composed of L. C. Norvell, O. C. Boone and Wm. McKeon, and was engaged in business of cotton factors and commission merchants at Memphis. In the early part of the year 1860, they were largely indebted; these debts were principally drafts or bills drawn by them on other parties and accepted in anticipation of cotton to be shipped by them, and consequently fluctuated in amount from time to time. On the 30th of March, 1860, Wm. McKeon, one of the partners, made a voluntary conveyance for the benefit of his wife and children, of a number of separate pieces of real estate in and near Memphis, some slaves and personal property. The firm was dissolved in less than a year afterwards, leaving a large amount of indebtedness unprovided for. The present bills were filed to set aside the deed of Wm. McKeon, and subject the property therein conveyed to the payment of the debts. The complainants in one of the bills are M. B. Brady & Co., who were merchants and factors at New Orleans; they claim a debt of from $12,000 to $14,000, with interest, a balance of a much larger debt. They were creditors of Norvell, Boone & Co. at the time the deed in question was made. The debts of the other parties, as well as those who came in by petition, were contracted afterwards.

The debts of Norvell, Boone & Co. on the 30th March, 1860, the date of McKeon's deed, amounted, according to the proof, to $40,000, and it is very

probable ·they were indebted to a much larger sum.
The debt to Brady & Co. at that date was $19,870.46,
between which time and the 8th of June, Brady & Co.
paid and accepted further drafts from Norvell, Boone
& Co. to the amount of over $35,000. On the latter
day a settlement was made between the parties, and
after allowing to Norvell, Boone & Co. credits for a
number of payments made subsequent to the 30th of
March, 1860, they executed to Brady & Co. their note
for the balance of $30,317.73, with an agreement in
writing, signed by Brady, to correct any error in the
account. The claim of Brady is for a balance on
this note.

The question is, whether the deed of ·McKeon for
the use of his wife and children, was in fraud of
Brady & Co.

It appears that McKeon was considered the solvent
man of his firm, on account principally of the real
estate he owned in and about Memphis, worth at the
time from $60,000 to $100,000. The property of the
other members of the firm was not large. Brady,
who was a brother-in-law of McKeon, gave credit to
the firm alone on the latter's account. The record
contains a letter from McKeon to Brady, dated 16th
February, 1860, which shows that it was in reply to
a letter of the 8th from Brady to McKeon, in which
Brady had cautioned McKeon against his partners,
Norvell and Boone, expressing the opinion that they
were wanting in integrity, and also warning McKeon
that his ·house was in danger. In reply, McKeon
expresses his gratitude not only for the warning, but

also for the previous accommodations extended to his firm, admitting the recent acceptance by Brady & Co. of their drafts for $23,000, which were then unpaid, which sums, however, he promises soon to meet by the shipment of cotton, but asks a renewal of a debt of $10,500, which his firm had assumed to Brady & Co. on account of the individual debts of himself and Boone, which latter sum he said they could not then meet. He further says that since receiving Brady's letter he had been looking closely into the business of his house and found it in a very healthy condition, and that by the 1st of April they would be very easy. He further assures Brady that his property was all paid for and in his own name and *should remain so during his life,* and be responsible for his debts. After this, from the 29th February, Brady & Co. accepted from Norvell, Boone & Co. to a very large amount; the greater part of which, however, Norvell, Boone & Co. afterwards paid or provided for.

It is argued in behalf of the defendants that nearly if not quite the entire debt of Brady & Co., in existence at the date of the deed in question, was afterwards paid, and that all or nearly all of the debt evidenced by the note of the 8th June, was contracted after the date and registration of the conveyance and with actual knowledge of its existence. It appears that in the account of Brady & Co., upon which the settlement of the 8th of June was made, there were charges for four bills or drafts drawn by Norvell, Boone & Co. and accepted by Brady & Co.; two payable in October and two payable in November, 1860;

all amounting, with commissions for acceptance, to $27,675.36. It is argued that if Norvell, Boone & Co. was indebted to Brady & Co. at all, it was only for those acceptances; that the balance of the account making up the note for $30,717.13, was erroneous, on account of commissions improperly charged, and other errors, and that the debt for these acceptances was at most but a subsequent debt, contracted with notice in face of the deed in question.

There is some uncertainty as to when these four bills were accepted by Brady. Boone testifies that they were accepted on the 8th June, the day of the settlement, and made for Brady's accommodation and to enable him to raise money upon them; but he fully disproves this in the subsequent part of his testimony.

It appears that Norvell, Boone & Co. purchased twenty-six slaves in South Carolina and paid for them in part with two of the above acceptances of Brady & Co., amounting to $18,000.00, and the balance with the acceptances of another firm, Richard Nugent & Co. They resold the slaves on the 14th May, 1860. Boone proves that he thinks they had them on hand about two months. This would fix the date of the purchase of the slaves as early as the 14th March, which was before the deed in question was made; at any rate, it appears from the books of Norvell, Boone & Co., that two of the four acceptances referred to were used before the 3d of May, in paying for the slaves. The other two drafts, from their numbers, appear to have been drawn before or at the same time; so it

is clear that these drafts were accepted by Brady & Co. as early as the 3d of May, but whether before the 30th of March or not is not clear. But if they were accepted after the 30th of March, we are of the opinion that Brady & Co. accepted without actual knowledge in fact of the deed in question. It is true Shanks, who was the agent of Brady & Co. in Memphis, proves that he accidently discovered the deed on the register's books a few days after its execution, though he thinks not as early as the 5th of April; his best recollection is he notified Brady & Co. of it very promptly. Brady, who was the active member of his firm at New Orleans, thinks he first learned of it on his visit to Memphis, which was about the 8th of June. The circumstances satisfy us that he did not in fact have knowledge of the deed when he made the four last acceptances above referred to. It fully appears that he was uneasy about the debt of Norvell, Boone & Co.; he caused Shanks to urge upon said firm the settlement of the debt, and for the same purpose sent up his book-keeper about the first of April, and finally came himself about the 8th of June. Outside of these four acceptances his debt was then small—not exceeding $3,000. It is not probable that he would, with a knowledge of the deed, then have increased the debt to the extent of $27,000, with no security but the note of the firm, especially as he had previously trusted the firm alone upon the faith of McKeon's individual property.

It is said, however, that the registration of the deed is conclusive notice that the creditors are pre-

sumed not to give credit upon the faith of the property conveyed in the deed. Such language is used in the case of *White* v. *Bettis & Capps*, MS., and *Martin* v. *Oliver*, 9 Hum., but this, we think, does not apply in a case like this where the creditor resided out of the State, had previously extended credit to the firm upon his faith in the property of the one member, and had been misled by the positive assurances so shortly before given by the latter that all his property was in his own name and should so remain during life and subject to his debts. *Churchill* v. *Wells*, 7 Col., 364. McKeon knew that Brady had no faith in the solvency of Norvell, Boone & Co. as a firm and trusted him alone; with this knowledge he gives him the positive assurance that his individual property is in his own name and should so remain, and yet within a very short time afterwards he makes this deed conveying, for the benefit of his wife and children, all his individual property real and personal, including eight different pieces of real estate, his slaves, his horse, rockaway, drays, cows, household and kitchen furniture, in fact all the individual property he owned, being the property on which Brady relied, worth from $60,000 to $100,000, and this while a large portion of Brady's debts remain unpaid; and not only this, he allows Brady to continue his acceptances in behalf of his firm, without calling his attention to the sudden change of purpose on his part in relation to his own property, notwithstanding they were brothers-in-law and on intimate terms. It appears that McKeon did not inform Brady of his conveyance. It appears

that one time during the spring of 1860, though the precise date is not shown, McKeon telegraphed to Brady begging him to accept their drafts or Norvell, Boone & Co. would fail, and that Brady did so, and it is admitted but for these acceptances the firm would then have failed; what drafts these were, does not appear.

Under these circumstances we hold that McKeon's voluntary conveyance is evidence of fraud in fact, and that the registration of the deed does not alter the case. Brady relied upon McKeon's word as to his purpose not to convey his property. We are satisfied that McKeon had himself become alarmed in regard to his firm, probably in fact on account of the warning of Brady, and he made this conveyance with a view to save his individual property in the event the firm failed.

It is not insisted that McKeon retained at the time of making this deed any individual property, unless it be some swamp or wild lands in Mississippi. The answer admits that the deed conveyed all or nearly all of his real estate. The grants for these Mississippi lands are afterwards found and filed as evidence, but there is no satisfactory proof that Mc-Kean still remained the owner thereof; but it is earnestly argued that the firm of Norvell, Boone & Co. was solvent and had ample assets to pay its debts. The nominal value of the assets was about $90,000, consisting principally in bills and accounts payable, but we think the proof does not show that these assets were available to creditors. It does not appear

that any considerable amount was afterwards realized; the payments subsequently made on the debts were made principally by creating new debts—assets of this character on paper are very delusive. They are not available to crediters; a debtor has no right to make a voluntary conveyance of all of his tangible property and leave his creditors to take their chances of realizing their debts from assets of this character. The twenty-six slaves, if on hand at the date of the conveyance, are not to be regarded as assets, for they were paid for with the acceptances of Brady & Co. and others, not included in the estimate of the indebtedness of the firm.

The fact that a large part of these debts were subsequently paid does not rebut the evidence of the fraud. Of course where a debtor, subsequent to his voluntary deed, pays all his debts, this rebuts the evidence of a fraudulent purpose alone from the voluntary conveyance. We have no doubt that McKeon intended to allow all the resources of his firm to go in payment of the debts; if they were thus satisfied it was all well, but if not, his purpose was to save his individual estate from the creditors. The payments made to Brady after the 8th June, as well as some payments made to other parties, were made by Norvell, Boone & Co. shipping goods to them to be sold or credited on the debts. These goods were bought in the summer and fall of 1866, in the northern and eastern cities, and the debts created by these purchases are the debts claimed by the complainants in the first named case of Levering & Co. and others, who came

in by petition.    As we hold the deed void as to Brady & Co. for fraud in fact, all the creditors will be allowed to share the proceeds.

The decree of the chancellor will be reversed, the deed in question declared void as to the creditors, and the cause referred to the clerk for an account o the debts.